**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GUILLERMO JUAREZ, as Independent )
Administrator of the Estate of EZEQUIEL )
JUAREZ, Deceased, )
           )
         Plaintiff, )
           )
      v. )
           )    Civil Action No. 13-145 Erie
BRYAN S. FRIESS and FEDEX )
GROUND PACKAGE SYSTEM INC., )
           )
         Defendants and )
         Third Party Plaintiffs, )
           )
      v. )
           )
ROBERT SARGENT, BOB SARGENT, )
LLC, MAYFLOWER TRANSIT, LLC, )
DARYL FLOOD RELOCATION, INC., )
DARYL FLOOD LOGISTICS, INC., )
GUILLERMO JUAREZ and JESSICA )
SNYDER, )
         Third Party Defendants. )

**MEMORANDUM OPINION**

**CONTI, Chief District Judge**

This civil action arises from a fatal multi-vehicular accident which occurred while the

decedent, Ezequiel Juarez ("Ezequiel"), was travelling westbound on Interstate 80 in the

Commonwealth of Pennsylvania. At the time of the accident, Ezequiel was a passenger in a

Chevy Cavalier driven by his brother, Guillermo Juarez ("Guillermo"). At some point during the

course of the collision sequence, a tractor-trailer operated by Bryan S. Friess ("Friess") on behalf

of FedEx Ground Package System, Inc. ("FedEx") impacted the Juarez brothers' Chevy

Cavalier. At some other point, the Chevy Cavalier also impacted another vehicle and a guardrail.

Ezequiel sustained fatal injuries in the process and died eleven days later. Thereafter, Guillermo, acting as administrator of Ezequiel's estate (the "Estate"), filed this lawsuit against Friess and FedEx (collectively, "defendants"). Defendants filed third-party claims against other business entities and individuals involved in the crash sequence, including Guillermo and another driver by the name of Jessica Kriston ("Kriston").[1]

Currently pending before the court are motions for summary judgment filed on behalf of Guillermo and Kriston relative to defendants' third-party claims. For the reasons set forth herein, Guillermo's motion for summary judgment will be denied and Kriston's motion for summary judgment will be granted.

## I. Factual Background

On the afternoon of February 25, 2012, Guillermo and Ezequiel Juarez were travelling westbound on Interstate 80 when they encountered blizzard-like conditions created by a snow squall. (JCSMF ¶¶ 1-2, 4; KCSMF ¶1.)[2] Guillermo drove the vehicle, a Chevy Cavalier, while Ezequiel occupied the front passenger seat. (*Id.*¶¶ 3-4.) Two of their friends, Nery Conde ("Conde") and Gregorio Pena ("Pena"), were travelling along the same route in separate vehicles. (Juarez Dep. at 52:23-53:1, 64:17-20, 98:10-20.)[3] Conde operated a Nissan pickup truck, while Pena drove a Volkswagen Cabriolet. (*Id.*) During this time and in the same general vicinity, Friess, on behalf of FedEx, was operating a tractor-trailer unit pulling twin trailers (the

[1] At the time of the accident, Kriston was known as "Jessica Snyder" and was travelling with Joshua Kriston, who is now her husband. Although she is referred to in the complaint by her maiden name, the court will refer to Kriston by her current legal name.

[2] Citations to "JCSMF ¶___" refer to third-party defendant Guillermo Juarez's Concise Statement of Material Facts (ECF No. 104), and defendants/third-party plaintiffs' responses thereto (ECF No.113). Citations to "KCSMF ¶___" refer to third-party defendant Kriston's Concise Statement of Material Facts (ECF No. 101) and defendants/third-party plaintiffs' responses thereto (ECF No. 110).

[3] The deposition of Guillermo Juarez is set forth in the record as Juarez Exhibit 3 (ECF No. 105-3) and Kriston Exhibit E (ECF No. 102-5).

"FedEx Unit" or the "FedEx Tractor-Trailer")(KCSMF ¶2; Defs.' Ex. C at 5, ECF No. 112-4), while Kriston drove a 2011 Subaru Legacy. (KCSMF ¶6.)

Unbeknownst to these various travelers, a number of other automobiles and commercial vehicles had previously collided with one another in the westbound lane of I-80, approximately two miles east of Exit 35 in Clinton Township, Venango County, Pennsylvania, resulting in a pileup that blocked both lanes of westbound traffic. (JCSMF ¶2, KCSMF ¶1; Defs.' Ex. C at 1, 14-16, ECF No. 112-4.) Dennis Simpson ("Simpson"), the driver of a Chevy Equinox, was stopped in the left hand lane of Interstate 80 behind a Home Depot truck that was blocking the roadway as the Juarez vehicle and the FedEx Unit approached the scene. (KCSMF ¶¶23-24; Simpson Dep. 10:14-12:20, 15:13-18:3.)[4]

What happened next is the subject of varying accounts, as will be discussed in more detail. What is not disputed is that a crash sequence ensued during which: (1) Friess intentionally drove the FedEx Tractor-Trailer into the median to the south of Interstate 80 in an attempt to avoid the pile-up that lay ahead; (2) as Friess attempted to drive off the interstate, there was an impact between the rear trailer of his unit and Kriston's Subaru Legacy; (3) while in the median, the FedEx Unit was impacted by another tractor-trailer unit operated by Robert Sargent on behalf of Mayflower Transit, LLC (the "Mayflower Unit"); (4) the FedEx Tractor-Trailer impacted the Juarez vehicle at some point either before or after the arrival of the Mayflower Unit; (4) at some point the Juarez vehicle also impacted the Chevy Equinox driven by Simpson as well as the end of the southern interstate guardrail; and, (5) Ezequiel sustained injuries which resulted in his death on March 7, 2012.

---

[4] The deposition of Dennis Simpson is set forth in the record as defendants' Exhibit E (ECF No. 112-6) and Kriston Exhibit C (ECF No. 102-3)

On February 1, 2013, this lawsuit was commenced in the United States District Court for the Northern District of Illinois (ECF No.1.). Because Ezequiel was a citizen of Illinois at the time of his death, the complaint asserted claims under the Wrongful Death Act of Illinois, 740 ILL. COMP. STAT. ANN. 180/1 *et seq*. (West 2012) (Count I), and the Illinois Survival Act, 755 ILL. COMP. STAT. ANN. 5/27–6 (West 2012) (Count II).

On May 28, 2013, the case was transferred to this judicial district pursuant to 28 U.S.C. §1406(a) (ECF Nos. 21, 22, 23). Thereafter, defendants filed third-party complaints against Guillermo (ECF No. 52), Kriston (ECF No. 51), and various parties affiliated with the Mayflower Unit (ECF No. 53). Those third-party defendants in turn filed various cross-claims, the substance of which is not relevant for present purposes.[5]

During the course of pretrial proceedings, the parties engaged in extensive fact and expert discovery. The numerous depositions and reports of record give rise to varying accounts of the subject crash sequence, the critical aspects of which are as follows.

A. Guillermo Juarez

Guillermo testified that, upon arriving at the crash site, he initially brought his vehicle to a stop off the left lane of the interstate without impacting any other vehicle or the guardrail. (Juarez Dep. at 115:2-118:23.) He exited the Chevy Cavalier to try and assist Conde, who had collided with another vehicle, while Ezequiel remained behind in the Cavalier. (*Id.* at 136:21-137:12, 139:7-140:2.) As he searched for Conde, Guillermo observed the FedEx Unit and a small car coming down the hill toward the accident site, at which point Guillermo and other bystanders jumped to safety over the northern interstate guardrail. (*Id.* at 140:12-141:21, 142:7-144:6, 147: 12-17.) After locating Conde and Pena, Guillermo was informed by them that a "big

---

[5] This court's original jurisdiction is premised on 28 U.S.C. §1332, as plaintiff and defendants have diverse citizenship. The court's jurisdiction over the third-party claims is premised on 28 U.S.C. §§ 1332 and 1367.

4

truck" had hit the Chevy Cavalier with Ezequiel still inside it.  (*Id.* at 140:4-8, 144:11-16.)

Guillermo, Conde and Pena then went to check on Ezequiel and observed him exiting the

Cavalier. (*Id.* at 145:18-23.)  Immediately after extricating himself, Ezequiel began to complain

that he could not breathe or move his arms.  (*Id.* at 67:13-68:18, 154:14-21.)  He was examined

at a nearby hospital and transferred to Allegheny General Hospital in Pittsburgh, where he later

died on March 7, 2012.  (JCSMF ¶¶ 8-9.)

B.  Nery Conde and Gregorio Pena

Guillermo's account is generally corroborated by the testimony of Conde and Pena, both

of whom testified that the Chevy Cavalier initially came to a safe stop and did not strike any

other vehicles until it was impacted by the FedEx Tractor-Trailer. (Conde Dep. at 18:7-20-19;

Pena Dep. at 31:4-12, 35:7-39:21.)[6]  Both Conde and Pena testified that the FedEx Unit struck

the Juarez vehicle prior to the arrival of the second tractor-trailer (i.e., the Mayflower Unit).

(Conde Dep. at 18:7-20-19; Pena Dep. at 39:7-43:4.)

C.  Trooper Ross Schons

Pennsylvania State Police Trooper Ross Schons investigated the crash scene and

generated a report containing the following summary of the collision sequence:

> This crash occurred as [Simpson's Chevy Equinox] was stopped in the left lane
> for a multi-vehicle crash that occurred in front of [it].  [The Juarez Chevy
> Cavalier] could not get stopped and struck [Simpson's vehicle] in the left rear,
> causing [Simpson's vehicle] to be pushed into the trailer of a [Home Depot] truck
> tractor and trailer … in front of it that [had been] involved in another crash….
> [The Juarez vehicle] then struck the guide rail and came to rest against the guide
> rail.  [Friess] attempted to avoid the crash and applied [his unit's] brakes and
> steered [the FedEx Tractor-Trailer] toward the median.  [The FedEx Tractor-
> Trailer] started to slide and was struck in the rear by [the Subaru Legacy driven
> by Kriston].  [Kriston's Subaru Legacy] then spun clockwise coming to rest in the

---

[6] Conde's deposition testimony is set forth in the record as defendants' Exhibit G (ECF No. 112-8).  Pena's
deposition testimony is set forth in the record as defendants' Exhibit H (ECF No. 112-9).

right lane. [The FedEx Tractor-Trailer] slid into the median and the trailer of [the FedEx Unit] struck [the Juarez vehicle] and came to rest facing south in the median. [The Mayflower Unit] struck the rear trailer of [the FedEx Unit] and came to rest against [the FedEx Unit's] trailer with the truck facing south and the trailer facing west on the south berm.

(Police Crash Report at 14-15, FedEx Ex. C, ECF No. 112-4.) Trooper Schons testified that it was his conclusion, based on his investigation, that the Juarez' Cavalier struck Simpson's Equinox and then the guardrail, prior to the involvement of the FedEx Tractor-Trailer. (Schon Dep. 40:7-42:3.)[7]

D. Dennis Simpson

Simpson testified that he was stopped in the left hand lane at the accident scene with his car in park no more than ten feet behind a Home Depot truck when he was suddenly struck from behind by another vehicle. (Simpson Dep. at 11:3-5, 12:15-20, 18:1- 20:20, 39:19-22.) The force of the collision pushed his Equinox forward such that it struck the Home Depot truck and bounced off. (Id. at 19:12-15, 20:10-13.) At that point, Simpson's passenger saw the FedEx Unit coming down the hill and told Simpson to run. (Id. at 21:10-16, 26:24-27:9, 36:17-37:5.) Simpson exited his car and was struck in the back by debris that flew from one of the vehicles as the FedEx Unit impacted the vehicle that had struck Simpson's Equinox. (Id. at 21:16-21, 24:2-4, 35:3.) Simpson claims he was knocked unconscious from the blow. (Id. at 21:16-21, 22:17-18.)

When he regained consciousness, a man whom Simpson assumed was the driver of the car that had struck him was asking if Simpson was okay. (Simpson Dep. at 23:2-6, 24:22-25:2, 28:20-22, 48:4-8.) Simpson described this individual as a heavy-set man who spoke with a Hispanic accent. (Id. at 27:13-28:14.) The man was bleeding from the head, talking on a cell

---

[7] Trooper Schons' deposition testimony is set forth in the record as defendants' Exhibit D (ECF No. 112-5) and Kriston Exhibit I (ECF No. 102-9).

phone, and telling other people that he was hurt. (*Id*. at 23:2-8, 27:13-17.) Simpson assumed the man was the driver of the vehicle that had struck him because he was standing so close to that vehicle. (*Id*. at 23:14-18, 49:12-15.) The man's car was smashed against the guardrail and was missing a steering wheel. (*Id*. at 23:9-18, 32:20-33:6, 52:11-15.) Although Simpson did not know the name of this individual, he later learned from law enforcement authorities that the man's last name was "Juarez." (*Id*. at 32:7-19.)

E. <u>William Schwerin</u>

William Schwerin was driving his vehicle westbound on Interstate 80 and, after encountering an unexpected whiteout with low visibility, he was involved in a collision at the pile-up scene prior to the arrival of the Juarez' vehicle. (KCSMF ¶¶ 15, 19.) After leaving his car, Schwerin stood in the median of the interstate, where he was able to observe the FedEx Tractor-Trailer approaching from the east and heading toward the accident scene. (*Id*. ¶20.) Schwerin perceived that the driver of the FedEx Tractor-Trailer purposefully diverted his unit into the grassy median to the north of the interstate. (*Id*.) According to Schwerin, the FedEx Tractor-Trailer did a "slight jackknife" as the tractor diverted to the left and into the median safely, without striking any vehicles. (*Id*. ¶22.)

F. <u>Jessica Kriston</u>

Kriston testified that, prior to encountering the crash scene, she was traveling at a decreased speed of about 20 to 30 mph with her hazard flashers engaged due to white-out conditions on the highway. (KCSMF ¶37.) Just prior to encountering the pile-up, Kriston observed the FedEx Tractor-Trailer passing her in the left lane, as she proceeded in the right lane. (*Id*.¶38). Kriston testified that, immediately after the FedEx Tractor-Trailer passed her vehicle, the trailer's back end jackknifed into her lane and struck her vehicle. (Kriston

Dep.18:25-20:19).[8]  Upon noticing the FedEx Unit sliding into her lane of travel, she applied her

brakes and swerved to the right in an effort to avoid the collision, but she could not avoid being

hit.  (*Id.* at 24:4-26:21.)  Kriston's testimony is generally corroborated by the testimony of her

husband (then-fiance) Joshua Kriston, who was travelling as a front-seat passenger in the Subaru

Legacy.  (KCSMF ¶41.)  Joshua Kriston testified that the Subaru was traveling in the right-hand

lane at about 25 to 30 miles per hour when the FedEx Unit passed by in the left-hand lane, with

the rear trailer then sliding into their lane of travel and impacting their car.  (Joshua Kriston Dep.

11:7-13:25, 24:3-25, 46:2-15, 93:2-94:17.)[9]

G. Brian Friess

Friess testified that he was originally driving the FedEx Unit in the right-hand lane of

Interstate 80 as he approached the crash site; however, he moved to the left lane when he was

about three miles east of the crash site in order to avoid vehicles that were parked on the right-

hand lane or berm.  (KCSMF ¶31.)  Friess testified that the first thing he saw at the accident

scene was a car on the median-side of the southern guardrail, a pick-up truck a little further to the

west, and a totally blocked interstate. (Friess Dep. at 73:4-10, 74:15-21, 75:17-25,166:24-

169:12.)[10]  He could tell that the car on the left had struck the guardrail because the car was

"crunched up" into the guardrail, but he could not tell whether the car had collided first with

another vehicle or just hit the guardrail on its own. (*Id.* at 74:25-75:11, 166:24-167:12.)  Friess

testified that, upon seeing the pile-up, he applied his brakes and intentionally diverted his rig to

---

[8] Kriston's deposition testimony is set forth in the record as third-party defendant Kriston's Exhibit G (ECF No. 102-7.)

[9] Joshua Kriston's deposition testimony is set forth in the record as third-party defendant Kriston's Exhibit H (ECF No. 102-8)
.

[10] Friess' deposition testimony is set forth in the record as third-party defendant Kriston's Exhibit F (ECF No. 102-6).

the left and into the median in order to avoid colliding with any other vehicles. (KCSMF ¶¶ 32, 35.) Friess claims that he was in control of his tractor-trailer at all times and was able to bring it to a stop without striking any other vehicles or the guardrail. (KCSMF ¶¶ 32, 35.)

Friess has no personal knowledge at all concerning Kriston or the car she was driving. (KCSMF ¶33.) He testified that he never observed a Subaru Legacy on the road and has no personal knowledge about whether that vehicle was involved in any collisions with other vehicles that day. (*Id*.) Friess had no knowledge that the tractor-trailer he was operating that day struck another vehicle, or that it was struck by another vehicle, including the Juarez vehicle or Kriston's Subaru Legacy. (*Id*. ¶34.)

H. George J. Wharton, P.E.

Defendants retained George J. Wharton, P.E. as an expert in the field of accident reconstruction. (JCSMF ¶16.) Mr. Wharton opined that, prior to the FedEx Unit's arrival at the crash scene, the Juarez Chevy Cavalier struck Simpson's Equinox while the Equinox was at a complete stop (Wharton Report at 50-51, 62-63, 72.);[11] the right front of the Juarez vehicle, where Ezequiel was seated, then struck the guardrail end on the south side of the westbound lanes. (*Id*. at 51-52, 62-63, 72.) Mr. Wharton found the Juarez vehicle damage to be consistent with a significant frontal impact, with the principal direction of force being applied to the right front of the vehicle. (*Id*. at 51-52.) According to Mr. Wharton, the impact of the Juarez vehicle striking Simpson's Equinox and then the guardrail broke the steering column of the Cavalier and damaged its dashboard. (*Id*. at 72.)

---

[11] Mr. Wharton's expert report is set forth in the record as defendants' Exhibits A (ECF No. 112-2) and C (ECF No. 109-3) and third-party defendant Kriston's Exhibit M (ECF No. 102-13).

Mr. Wharton opined that, following these events, the FedEx Tractor-Trailer was brought to a controlled complete stop in the median without striking the Juarez vehicle. (JCSMF ¶17; Wharton Report at 66-68, 71, 73.) More specifically, Mr. Wharton concluded that:

- the FedEx tractor drove into the median along a set of well-defined tracks in the grassy median;

- the truck had slowed to 26 miles per hour or less when it started into the median;

- the FedEx tractor and trailers were in the median and stopped prior to being struck by the Mayflower tractor; and

- no part of the FedEx vehicle came into contact with the Chevrolet Cavalier before the FedEx trailers were pushed to the west by the Mayflower Vehicle.

(Wharton Report at 73, ¶¶3, 4, 6 and 10.)

I.  Jodie E. Immell, B.S.

The Estate retained Jodie E. Immell, B.S., to perform an accident reconstruction and evaluation of the sequence of impacts as they relate to the involvement of the Juarez vehicle. (JCSMF ¶55; Immell Report at 1.)[12] Ms. Immell concluded that the Juarez vehicle did not impact the guardrail or Simpson's Equinox prior to the involvement of the FedEx Unit. (*Id*. at 8.) She thought the damage to the Equinox's rear bumper was most likely caused by its impact with the interstate guardrail, as opposed to the Juarez vehicle having struck the Equinox in a front-to-rear manner. (*Id*. at 7-8.) To the extent an engagement did occur between the right side of the Juarez vehicle and the Equinox, Ms. Immell opined that this was "likely as a result of the Juarez Chevrolet being pushed into the Chevrolet Equinox by the rear-end impact from [the] FedEx [Unit] and pinching the guardrail in between the two Chevrolets." (*Id*. at 8.) Ms. Immell assessed the sequence of pertinent impacts as follows:

---

[12] Ms. Immell's report is set forth in the record as plaintiff's Exhibit 4 (ECF No. 105-4), FedEx Exhibits B (ECF No. 112-3) and F (ECF No. 109-6), and Kriston Exhibit K (ECF No. 102-11).

- Crash 1: FedEx right rear trailer [the second trailer] to left rear Juarez Chevrolet, after FedEx [Tractor-Trailer] lost control

- Crash 2: FedEx/Juarez Chevrolet/Guardrail to Chevrolet Equinox, pushed Chevrolet Equinox into the Home Depot truck

- Crash 3: Front and right of Mayflower [Unit] to left side of FedEx [Tractor-Trailer.]

(*Id.* at 9.)

J.  Donald K. Eisentraut, P.E.

Third-party defendant Kriston retained Donald K. Eisentraut, P.E., to perform an accident reconstruction analysis of her collision with the FedEx Tractor-Trailer. Mr. Eisentraut's report thus "evaluates the involvement of the Subaru Legacy, driven by Jessica Snyder Kriston, in the crash events relative to the fatal injuries sustained by Ezequiel Juarez…" (Eisentraut Report at 2.)[13] Based upon his analysis, Mr. Eisentraut found that Kriston's Subaru was traveling in the right-hand lane of the highway at the time of her collision with the FedEx Unit's rear trailer. (*Id.* at 2, 7.) According to Mr. Eisentraut, "[t]he physical evidence showed that the left front of the Subaru contacted the right rear of the second trailer in a small overlap collision." (*Id.* at 5-6.) To determine the severity of this collision, Mr. Eisentraut evaluated the damage to the Subaru using estimated crush measurements of the vehicles. (*Id.* at 6.) Mr. Eisentraut concluded that the Subaru experienced a Delta-V force of approximately 10 to 18 miles per hour (*id.* at 6-7), and this "10 to 18 mph speed change of the Subaru would have resulted in an approximate 1 mph or less speed change for the FedEx tractor-trailer." (*Id.* at 7.) Based upon this information, Mr. Eisentraut concluded that "[t]he collision of the Subaru with the FedEx tractor-trailer that had begun to turn into the median at the time had no effect on the course of the tractor-trailer and no involvement in the cause or severity of subsequent collisions of other vehicles." (Id. at 7.)

---

[13] Mr. Eisentraut's expert report is set forth in the record as defendants' Exhibit B (ECF No. 109-2).

## II. Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir.2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *see Doe v. Abington Friends Sch*., 480 F.3d 252, 256 (3d Cir.2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing *Anderson*, 477 U.S. at 248; *Celotex Corp*., 477 U.S. at 322–23)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986)).  In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  *Woodside v. Sch. Dist. of*

*Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir.2001); *Doe v. Cnty. of Centre*, 242 F.3d 437, 446 (3d Cir.2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir.1999).

## III. Discussion

In this case, defendants' principal defense is their complete denial of any liability arising from the underlying crash incident. In particular, defendants deny that the FedEx Tractor-Trailer ever struck the Juarez vehicle prior to being pushed into the Juarez vehicle by the Mayflower Unit. Defendants' third-party complaints are styled as alternative, contingent claims for contribution against the various third-party defendants in the event that defendants Friess and FedEx are held liable for Ezequiel's death. Consistent with this alternative theory, defendants allege that, if they were in fact negligent, then the various third-party defendants may be joint tortfeasors whose negligent acts combined with their own to cause Ezequiel's death. Both Kriston and Guillermo have moved for summary judgment relative to the defendants' third-party contribution claims against them.

### A. *Guillermo's Motion for Summary Judgment*

Guillermo argues that summary judgment is appropriate because defendants are improperly attempting, under the guise of a third-party complaint, to present a defense based on the theory that Guillermo is *solely* liability for Ezequiel's death. According to Guillermo, the respective accident reconstruction theories proffered by defendants' expert (Mr. Wharton) and by the Estate's expert (Ms. Immell) give rise to a situation where the liability of either party is necessarily exclusive of the other. That is, defendants cannot reach their claim for contribution (according to Guillermo) unless the jury accepts plaintiff's reconstruction of the accident and rejects the defendants' reconstruction theory, in which case the jury would necessarily have found that Guillermo did not breach any duty of care to Ezequiel. Guillermo concludes that

there is no plausible scenario by which he could be found derivatively or secondarily liable to defendants and, therefore, there is no legal basis for defendants' third-party claim against him.

The court is not persuaded that the present state of the record renders defendants' third-party complaint against Guillermo insufficient as a matter of law. "'Where ... state substantive law recognizes a right of contribution and/or indemnity, impleader under Rule 14 is the proper procedure by which to assert such claims.'" *Herndon Borough Jackson Twp. Joint Mun. Auth. v. Pentair Pump Grp., Inc*., No. 4:12-CV-01116, 2015 WL 2166097, at *2 (M.D. Pa. May 8, 2015) (quoting *In re One Meridian Plaza Litig*., 820 F. Supp. 1492, 1496 (E.D. Pa. 1993) (citing *Smith v. Whitmore*, 270 F.2d 741 (3d Cir.1959)) and *Pennine Res., Inc. v. Dorwart Andrew & Co*., 639 F. Supp. 1071 (E.D. Pa. 1986)) (ellipsis in the original). Relevantly, Pennsylvania's Uniform Contribution Among Tortfeasors Act ("UCATA"), 42 PA. CONS. STAT. §§ 8321-8327, recognizes a right of contribution among joint tortfeasors. *See id*. §8324(a).[14] "Joint tortfeasors" are defined under the UCATA as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been collected against some or all of them." *Id*. at §8322. The principles of joint and several liability for joint tortfeasors has been aptly summarized by the Pennsylvania Superior Court as follows:

> Under Pennsylvania law, it is well-established that if the tortious conduct of two or more persons combines to cause a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently.

---

[14] As a federal court sitting in diversity, this court must apply the substantive law of the state in which this court sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Here, despite the fact that the Estate is pursuing claims under Illinois' wrongful death and survival statutes, the parties have implicitly agreed that Pennsylvania law governs the legal issues that are implicated by the pending summary judgment motions, as they have discussed only Pennsylvania law in their respective briefs. Accordingly, the court need not engage in a choice-of-law analysis and will apply Pennsylvania law in the present situation. *See Schiavone Constr. Co. v. Time, Inc*., 735 F.2d 94, 96 (3d Cir.1984)) (where the parties implicitly agreed that New Jersey law governed their diversity action, district court applied such law, and New Jersey had an interest in the outcome of the litigation, the court of appeals would not challenge the parties' choice of law determination); *84 Lumber Co., L.P. v. Bryan Const. Co*., Case No. 2:09–cv–1030, 2011 WL 666209, at *5 (W.D. Pa. Feb.14, 2011) ("In this case, the parties do not dispute that Pennsylvania law applies to this case, and the Court need not engage in a choice of law analysis.") (citing *Schiavone Const. Co*., 735 F.2d at 96).

> *Kovalesky v. Giant Rug Market*, 422 Pa. Super. 116, 618 A.2d 1044 (1993);
> *Capone v. Donovan*, 332 Pa. Super. 185, 480 A.2d 1249 (1984). Joint tortfeasors
> are, by definition, jointly and severally liable to the plaintiff for his or her injuries.
> 42 Pa.C.S. § 8322. Imposition of joint and several liability enables the injured
> party to satisfy an entire judgment against any one tortfeasor, even if the
> wrongdoing of that tortfeasor contributed only a small part of the harm inflicted.
> *Glomb v. Glomb*, 366 Pa. Super. 206, 530 A.2d 1362 (1987) (*en banc*), *appeal
> denied*, 517 Pa. 623, 538 A.2d 876 (1988). Thus, if the court imposes joint and
> several liability, and if only one of the joint tort-feasors is financially responsible,
> the injured party can attempt to recover the full measure of damages against that
> single source. The financially responsible tort-feasor who satisfies more than his
> or her equitable share of the joint liability then bears the risk of recovering the
> excess from his or her less responsible fellow tort-feasors. *Id*. 530 A.2d at 1365
> (citations omitted).

*Baker v. AC&S, Inc.*, 729 A.2d 1140, 1146-47 (Pa. Super. Ct. 1999) *aff'd sub nom. Baker v. AC
and S*, 755 A.2d 664 (Pa. 2000).

As Guillermo correctly observes, a party may be impleaded under Federal Rule of Civil
Procedure 14(a) only where his liability is derivative or secondary. *See Herndon Borough
Jackson Twp. Joint Mun. Auth.*, 2015 WL 2166097, at *2 ("[A] 'third-party complaint may not
set forth a claim that the third party defendant is directly liable to the original plaintiff; it is
limited to claims of secondary or derivative liability.'") (quoting *In re One Meridian Plaza
Litig.*, 820 F. Supp. at 1496). A claim for contribution, however, satisfies this requirement,
inasmuch as the claim does not accrue until the third-party plaintiff has paid more than his share
of a liability judgment. *See* 42 PA. CONS. STAT. §8324(b) ("A joint tort-feasor is not entitled to a
money judgment for contribution until he has by payment discharged the common liability or has
paid more than his pro rata share thereof."). As the Pennsylvania Superior Court has explained,
"a tortfeasor's right to receive contribution from a joint tortfeasor derives not from his liability to
the claimant but rather from the equitable principle that once the joint liability of several
tortfeasors has been determined, it would be unfair to impose the financial burden of the
plaintiff's loss on one tortfeasor to the exclusion of the other." *Svetz for Svetz v. Land Tool Co.*,

513 A.2d 403, 407 (Pa. Super. Ct. 1986). Thus, if defendants have a basis in the record to assert a contribution claim against Guillermo, their third-party complaint is appropriate.

Fundamentally, Guillermo takes issue with defendants' theory that defendants and he may be joint tortfeasors. According to Guillermo, the framing of the parties' respective accident reconstruction theories precludes a finding of shared liability.

This court does not agree. It is true that Mr. Wharton's opinions, if fully credited, would exonerate defendants relative to Ezequiel's fatal injuries, while Ms. Immell's opinions exonerate Guillermo and place responsibility for the fatal crash sequence on Friess's allegedly negligent operation of the FedEx Tractor-Trailer. The factfinder, however, will not be constrained at trial to credit – exclusively and entirely – only one expert's opinion. Instead, the factfinder may choose the weight, if any, to be given to the parties' respective expert opinions, and it may accept or reject any part of the testimony that is presented. *See Finjan, Inc. v. Symantec Corp.*, No. 10-CV-593 (GMS), 2013 WL 5302560, at *28 (D. Del. Sept. 19, 2013) (noting that "[i]t is the province of the jury to assess the testimony of each expert witness and determine, viewed in light of the other evidence presented at trial, which was most credible and/or persuasive"; thus, where "[n]either side presented evidence that went unchallenged, ... the jury was free to accept or reject the testimony of each witness in whole or in part"), *aff'd*, 577 F. App'x 999 (Fed. Cir. 2014); *Adams v. Sheldon*, No. CIV. 04-251-LPS, 2012 WL 3779110, at *3 (D. Del. Aug. 31, 2012) (noting that the "jury was free, as it was instructed, to believe or disbelieve [the] testimony [of plaintiff's medical expert], in whole or in part, just like that of any other witness."); *Tindal v. Dist. Attorney of City of Phila.*, No. CIV.A. 04-3932, 2005 WL 745939, at *4 (E.D. Pa. Mar. 30, 2005) ("The trial court clearly and accurately instructed the jury on the factors to use in assessing the credibility of a witness, including the concept that the jury was free to accept all, part, or

none of the witness's testimony."); *accord Nelson v. Hines*, 653 A.2d 634, 637 (Pa.1995) ("[T]he jury is free to believe all, some, or none of the testimony presented by a witness ... up until the point at which [its] verdict is so disproportionate to the uncontested evidence as to defy common sense and logic.").

Given the jury's prerogative to credit or reject any part of the evidence presented at trial, it is possible that a jury could reasonably determine that negligent conduct on the part of both Friess and Guillermo combined to bring about a single injury – namely, Ezequiel's death. The accounts of Simpson, Friess, Trooper Schons, and Mr. Wharton tend to support the conclusion that Guillermo struck the Simpson vehicle while it was at a standstill and also struck the end of the interstate guardrail, prior to the arrival or involvement of the FedEx Unit. If this conclusion is credited, it could in turn support a reasonable inference that Guillermo negligently operated the vehicle that he and Ezequiel were traveling in and that this negligence was a substantial factor in bringing about Ezequiel's death, because Ezequiel sustained fatal injuries as a result of these initial impacts or because Guillermo's negligence placed Ezequiel in the position where he would foreseeably sustain injury from other vehicular impacts. As for defendants' liability, the accounts rendered by Ms. Immell, Guillermo, Conde, Pena, and Trooper Schons all support an inference that Friess negligently failed to control his tractor-trailer, resulting in an impact with the Juarez vehicle prior to the arrival of the Mayflower unit. As noted, Pennsylvania courts have traditionally found joint tortfeasor status where the independently culpable actions of two parties combine to produce a single injury, such as death. *See, e.g., Harsh v. Petroll,* 887 A.2d 209, 219 (Pa. 2005) (holding that tractor-trailer owner and automobile manufacturer were joint torfeasors where the tractor-trailer driver's negligence and a design defect in the decedents' automobile were both substantial factors that caused the decedents' deaths).

Guillermo argues that, even if negligence on his part can be established, defendants' third-party contribution claim necessarily fails because defendants did not show, beyond mere speculation, that any negligence on Guillermo's part actually caused Ezequiel's fatal injuries. This line of argument is unavailing.

To recover under a theory of negligence under Pennsylvania law, a complainant must establish, among other elements, a causal connection between a breach of duty and the resulting injury. *See R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005); *Younger v. Keresters,* No. 2253 C.D. 2014, 2015 WL 6526970, at *3-4 (Pa. Commw. Ct. Oct. 28, 2015). "To satisfy the requirement of causation, the complainant must demonstrate that the breach was both the proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. Ct. 1993) (citing *McDonald v. Marriott Corp.*, 564 A.2d 1296, 1298 (Pa. Super. Ct. 1989)). "Proximate cause is a question of law, to be determined by the judge, and it must be established before the question of actual cause may be put to the jury." *Id.* (citing *Novak v. Jeannette Dist. Mem. Hosp.*, 600 A.2d 616, 618 (Pa. Super. Ct. 1991); *Askew by Askew v. Zeller*, 521 A.2d 459, 463 (Pa. Super. Ct. 1987)). "A determination of [proximate, or] legal causation, essentially regards 'whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently, occurred.'" *Id.* (quoting *Novak*, 600 A.2d at 618 (citation omitted) (latter two alterations in the original). For purposes of determining whether a defendant's negligence is the proximate cause of the claimant's injury, Pennsylvania courts utilize the "substantial factor" test set forth in the Restatement of Torts. *Stamper-Murray v. U.D.H. Mgmt. Corp.*, No. 1:14-CV-1360, 2015 WL 3840937, at *4 (M.D. Pa. June 22, 2015) (Report and Recommendation adopted by the district court).

> Under this test, a defendant's negligent conduct is not the proximate cause of
> plaintiff's injury unless "the alleged wrongful acts were a substantial factor in

bringing about the plaintiff's harm." *E.J. Stewart, Inc. v. Aitken Prods., Inc.*, 607
F. Supp. 883, 889 (E.D.Pa.1985), *aff'd*, 779 F.2d 42 (3d Cir.1986). "What is
required is evidence, which means some form of proof; and it must be evidence
from which reasonable persons may conclude that, upon the whole, it is more
likely that the event was caused by negligence than it was not." *Hamil*, 392 A.2d
at 1285; *see also* W.P. Keeton et al., Prosser and Keeton on Torts § 39, at 242 (5th
ed.1984); *Farnese v. Southeastern Pennsylvania Transp. Auth.*, 338 Pa. Super.
130, 487 A.2d 887, 889 (Pa.Super.1985) (quoting *Flagiello v. Crilly*, 409 Pa. 389,
187 A.2d 289 (Pa.1983)); *Smith v. Bell Tel. Co.*, 397 Pa. 134, 153 A.2d 477
(Pa.1959) (requiring plaintiff to establish sufficient facts for jury to conclude
preponderance favors liability). Importantly, although the issue of proximate
cause is a question of law, the Pennsylvania Supreme Court has instructed that the
question of whether a defendant's conduct was a substantial or an insignificant
cause of a plaintiff's harm "should not be taken from the jury if the jury may
reasonably differ" as to the question. *Ozer v. Metromedia Rest. Group*, 2005 U.S.
Dist. LEXIS 3447, *11–*12, 2005 WL 525400 (E.D.Pa.2005); *Ford v. Jeffries*,
474 Pa. 588, 379 A.2d 111 (Pa.1977); *see also Redland Soccer Club*, 55 F.3d at
827 (proximate cause is traditionally an issue for the jury). Pennsylvania courts
also have stated with equal clarity that a jury may draw inferences from the
evidence presented to determine whether the facts support a finding of causation.
*See First v. Zem Zem Temple*, 454 Pa. Super. 548, 686 A.2d 18, 21 (Pa. Super. Ct.
1996) ("[I]t is enough that there be sufficient facts for the jury to say reasonably
that the preponderance favors liability."). Conventional case law instructs that
inconsistencies in a witness's testimony should be left to a jury to decide. *Strother
v. Binkele*, 256 Pa. Super. 404, 389 A.2d 1186, 1191 (Pa. Super. Ct. 1978). *Lowe
v. Pirozzi*, No. CIV.A. 05–5048, 2006 WL 1147238, at *34 (E.D. Pa. Apr. 26,
2006).

*Stamper-Murray*, 2015 WL 3840937, at *4-5.

Factual or "but for" causation entails proof that the alleged injury would not have

occurred "but for" the defendant's act; it has been described as a *de minimis* standard separate

and apart from the "substantial factor" standard of legal causation. *Kalgren v. Huber,* 2007 WL

674605, at *4 (W.D. Pa. Mar. 1, 2007) (citing *Mahon v. W.C.A.B.*, 835 A.2d 420, 428-29 (Pa.

Commw. Ct. 2003); *Takach v. B.M. Root Co.*, 420 A.2d 1084, 1086-87 (Pa. Super. Ct. 1980)).

Here, a factfinder could reasonably infer the existence of a direct and substantial

connection between Guillermo's alleged negligence and Ezequiel's death. It is undisputed that

Guillermo was operating the vehicle in which Ezequiel was a passenger at the time of the

underlying accident, which occurred in blizzard conditions. As previously discussed, there is

evidence which could support a finding that Guillermo was unilaterally responsible for striking the Simpson vehicle, as well as the end of the interstate guardrail, prior to Friess' arrival on the scene. Mr. Wharton opined that the Juarez vehicle would have retained significant forward velocity while sliding sideways into the Equinox, and the jury could conclude that the impact was forceful enough to propel Simpson's parked vehicle forward some ten feet into the side of the Home Depot flatbed trailer. (Wharton Rep. at 50-51.)  Mr. Wharton also opined that the right front of the Juarez vehicle, where Ezequiel was seated, struck the end of the guardrail, shifting the vehicle's frame to the left.  (*Id*. at 51.)  According to Mr. Wharton, this frontal impact with the guardrail was sufficient to break the steering column and damage the dashboard in the Juarez vehicle.  (*Id.* at 72.)

Apart from the evidence of impact damage, there is evidence to support a finding that Guillermo's operation of the Chevy Cavalier placed Ezequiel in a position where the Cavalier would foreseeably sustain further impacts from other vehicles arriving on scene. There is no dispute that, as a result of its various collisions, the Juarez vehicle was totaled.  The testimony shows that Ezequiel complained of serious physical symptoms immediately following the crash sequence, and the parties do not appear to dispute that he died from injuries sustained in the underlying accident. Collectively, this evidence is sufficient to support an inference that Guillermo's negligent operation of the Chevy Cavalier was a substantial factor in bringing about Ezequiel's fatal injuries, although the jury would necessarily not be required to draw that inference. *See Stamper-Murray*, 2015 WL 3840937, at *4 (noting that proximate causation need not be proved by direct evidence, and a claimant may rely on circumstantial evidence for proof) (citing *Galullo v. Federal Express Corp.*, 937 F.Supp.2d 392 (E.D.Pa.1996)).  Accordingly, the issue of causation as it bears on defendants' third-party claim against Guillermo must be

determined by the jury at trial. *See Travelers Indemn. Co.v. Stengel,* Civil Action No. 08-cv-2583, 2011 WL 6739458, at *7 (E.D. Pa. Dec. 22, 2011) ("Pennsylvania law clearly states... that unless the evidence is such that reasonable minds cannot disagree, the question of whether a defendant's conduct is a cause of the plaintiff's injury or loss is for the jury."), *aff'd,* 512 F. App'x 249 (3d Cir. 2013).

To the extent Guillermo argues that there is no basis for apportioning liability as between himself and the third-party plaintiffs, the court declines to award summary judgment on this basis. In this respect, the court notes an important change in Pennsylvania's comparative negligence laws, which became effective in 2011. Prior to June 28, 2011, Pennsylvania's comparative negligence statute essentially codified the common law rule of joint and several liability in cases where recovery against more than one defendant was possible. *See* 42 PA. CONS. STAT. ANN. §7102 (West 2010) (directing that, in such cases, the "plaintiff may recover the full amount of the allowed recovery from any defendant," and "[a]ny defendant who is so compelled to pay more than his percentage share may seek contribution."). The Pennsylvania Supreme Court has explained that the common law doctrine of joint and several liability, as previously codified at 42 PA. CONS. STAT. ANN. §7102, "evolved on the theory that, as between an injured, innocent plaintiff and defendants whose breach of some duty is proximately related to the injury, it is preferable to allocate the risk of a default in the payment of due compensation to the defendants." *Harsh v. Petroll,* 887 A.2d 209, 217 (Pa. 2005). Consistent with this theory, Pennsylvania courts traditionally placed the burden of proving apportionment of liability on the tortfeasor seeking to limit his liability *vis-a-vis* other responsible tortfeasors. *See, e.g., Glomb v. Ginosky,* 530 A.2d 1362, 1366 (Pa. Super. Ct. 1987) (where minor plaintiff had suffered a single harm at the hands of different tortfeasors, "[t]he availability of apportionment therefore hinge[d]

21

upon whether the party who [sought] it [could] demonstrate some logical, reasonable or practical basis for assigning discrete portions of the over-all liability to discrete causes")(citing RESTATEMENT (SECOND) OF TORTS §433(A) comment d and §433B(2), among other authority). Here, Guillermo appears to be arguing that defendants' contribution claim fails as a matter of law because there is no rational basis upon which an apportionment of liability can be made as between Guillermo and defendants.

Notably, however, the Pennsylvania General Assembly effectuated major changes to the Commonwealth's comparative negligence statute, effective June 28, 2011. *See* P.L. 78, No. 17, §1 June 28, 2011 (imd. effective), codified at 42 PA. CONS. STAT. ANN. §7102 (West 2016). As it relates to this case,[15] the current statutory scheme imposes a base-line presumption of several liability, except where a defendant "has been held liable for not less than 60% of the total liability apportioned to all parties." 42 PA. CONS. STAT. ANN. §7102(a.1)(3)(iii). Thus, if a defendant is less than sixty percent liable for the plaintiff's injury, that defendant is subject only to several liability for his proportionate share of the total liability. A defendant found to be at least sixty percent liable is subjected to joint and several liability and may seek contribution from other tortfeasors after discharging more than his proportionate share of the total liability. *See id.* §7102(a.1)(4). The statute provides that "[f]or purposes of apportioning liability only, the question of liability of any defendant or other person who has entered into a release with the plaintiff with respect to the action and who is not a party shall be transmitted to the trier of fact upon appropriate requests and proofs by any party." *Id.* §7102(a.2). The statute preserves a defendant's right to "join another potentially responsible party" in the action, *id.* §7102(c.2), and it expressly defines the term "defendant" to include an impleaded defendant. *Id.* §7102(d).

---

[15] Because the accident giving rise to this lawsuit occurred in February 2012, the 2011 amendments to Pennsylvania's comparative negligence statute apply to this case.

The upshot of these changes is that defendants in this case will not be held jointly and severally liable – and thus, will have no basis to seek contribution from Guillermo through their third-party complaint – unless and until they are found to be at least sixty percent liable for the plaintiff's injury. The matter is further complicated by the fact that the factfinder's ultimate apportionment of liability may include consideration of any third-party defendant that enters into a settlement with the plaintiff between now and time of trial.

Based upon these considerations, and based further upon the existence of clearly disputed issues of historical fact relative to the particulars of the underlying crash sequence, the court concludes that Guillermo is not entitled to summary judgment relative to defendants' contribution claim against him. To the extent challenges to causation or apportionment become relevant at time of trial, they can be revisited by way of a Rule 50 motion. Accordingly, Guillermo's motion for summary judgment will be denied.

### B. *Kriston's Motion for Summary Judgment*

In her motion for summary judgment, Kriston argues that defendants failed to produce evidence that would show a breach of duty on her part or that such breach proximately caused Ezequiel's fatal injuries. Having reviewed the evidence of record in the light most favorable to defendants/third-party plaintiffs, the court nevertheless finds that Kriston's motion is well-taken because, even if Kriston's negligence is established, there is insufficient evidence from which a jury could reasonably find that any negligence on her part was a substantial factor in bringing about Ezequiel's fatal injuries.

To begin, there is no contention by the parties, or evidence to suggest, that Kriston's Subaru collided directly with the Juarez vehicle. To the contrary, it is undisputed that Kriston's vehicle collided with the FedEx Tractor-Trailer – viewing the proferred facts in the light most

favorable to defendants, which subsequently collided with the Juarez vehicle. Fairly read, none of the expert opinions in this case support the conclusion that Kriston's Subaru contributed in any substantial way to the FedEx Unit's ultimate course of travel or its subsequent impact with the Juarez vehicle. Defendants' expert, Mr. Wharton, made no finding to the effect that Kriston's impact with the FedEx Tractor-Trailer somehow contributed to the subsequent impact between the FedEx Tractor-Trailer and the Juarez vehicle; on the contrary, it is Mr. Wharton's opinion that the FedEx Unit initially came to rest in the median without striking any other vehicles and did not impact the Juarez vehicle until *after* being struck by the Mayflower Unit. This opinion is consistent with Friess' testimony that he never lost control of his tractor-trailer and that his vehicle came to rest safely in the median prior to being impacted by the Mayflower Unit. Neither the findings of Mr. Eisentraut nor those of Ms. Immell substantiate the defendants' third-party claim against Kriston.

Defendants theorize that the impact from Kriston's Subaru striking the rear FedEx trailer affected both the speed and the direction of the FedEx Unit. Specifically, they cite Mr. Eisentraut's report and Ms. Immell's deposition testimony as establishing that the impact from Kriston's vehicle caused the speed of the FedEx Tractor-Trailer to increase by 1 to 3 miles per hour as it attempted to exit Interstate 80 into the median. Defendants also cite Ms. Immell's testimony that the Subaru's impact may have accentuated the rotation of the FedEx Unit's rear trailer. Finally, defendants cite Ms. Immell's testimony and Mr. Wharton's report as establishing that the FedEx Unit was travelling approximately 15 to 18 miles per hour as it left the roadway and that it continued to slow as it approached the accident scene. From this, defendants infer that a 3 mile-an-hour increase in the speed of the rear trailer as a result of being struck by Kriston's Subaru accounts for at least 20 percent of the speed of the FedEx Unit (i.e., 15 mph or less) as it

24

allegedly collided with the Juarez vehicle. Because it is undisputed that the FedEx Tractor-Trailer was continuing to slow at the time it was struck by Kriston, defendants submit that the proportionate effect of the speed of the FedEx Unit could be even greater. Defendants maintain that this evidence, collectively, is sufficient to create a genuinely disputed issue of fact about whether the impact from Kriston's Subaru was a proximate cause of Ezequiel's injuries.

The court finds defendants' theory to be untenable based on a fair reading of the record. Mr. Eisentraut opined that, due to the weight differential between the two vehicles, the delta force exerted by Kriston's Subaru on the FedEx Tractor-Trailer in the course of their collision would have resulted in approximately a 1 mile-per-hour or less speed change in the FedEx Unit. (Eisentraut Report at 7.) According to Mr. Eisentraut, this would not have affected the speed, position, or subsequent collisions of the FedEx trailers. (*Id.*) In sum, Mr. Eisentraut concludes that the collision between Kriston's Subaru and the FedEx tractor-trailer had no effect on the course of the FedEx unit and no involvement in the cause or severity of the subsequent collisions of the other vehicles. Nothing in Mr. Eisentraut's opinion supports the conclusion that Kriston's actions were a substantial factor in Ezequiel's death.

Defendants' theory of causation is also untenable to the extent it relies on Ms. Immell's estimation that the collision between the Subaru and the FedEx Tractor-Trailer effectuated a 3 mile-per-hour speed change in the latter vehicle. Ms. Immell actually estimated a 3 mile-per-hour speed change in the *rear trailer* of the FedEx unit, and an even smaller speed change relative to the FedEx Unit as a whole. (Immell Dep. at 142:1-12.) Ms. Immell opined that the primary contact between Friess's and Guillermo's respective vehicles occurred when the *first* FedEx trailer struck the Juarez vehicle. (Immell Dep. at 81:15-22, 82:4-15.) Ms. Immell's testimony does not reasonably support defendants' theory that the collision between Friess and

Kriston accounted for a twenty percent increase in the speed of the FedEx Tractor-Trailer and a substantially more forceful collision between the FedEx Unit and the Juarez vehicle. Ms. Immell, like Mr. Eisentraut, unequivocally opined that any speech change resulting from the impact between Kriston's vehicle and Friess' tractor-trailer did not substantially alter the movement of the FedEx tractor-trailer or affect its contact with the Juarez' Chevy Cavalier.  (Immell Dep. at 140:11-20.)  Consistent with this view, Ms. Immell did not address the Subaru-FedEx Unit collision as a pertinent impact for purposes of her report.  (*Id*. at 139:8-140:5.)

Defendants also did not show that the Subaru-FedEx Unit collision affected the rotation of Friess's tractor-trailer in a manner that could have proximately caused Ezequiel's injuries. Ms. Immell testified (outside the scope of her report) that Kriston's collision with the FedEx Unit may have accentuated the rotation of the *second* trailer, but she opined that the collision did not "otherwise ... translate to a major change in velocity for the tractor or trailer 1 or their movement."  (Immell Dep. 141:19-22.)  Ms. Immell did not attempt to quantify the extent of this additional rotation because, in her view, "it really didn't play a large role in the impact between Trailer 1 and the Juarez Chevrolet."  (*Id*. at 142:13-20.)

Although, as previously noted, a jury is generally free to determine what weight, if any, should be given to an expert's opinion, in this case, all of the expert testimony supports the conclusion that Kriston's negligence, if any, had no substantial effect on the FedEx Unit's course of travel or its impact with the Juarez vehicle.  As discussed, *supra*, issues of causation are generally factual inquiries left for the jury's determination; however, like any factual issue, causation may be determined by the court as a matter of law when the evidence would permit only one finding.  *See Travelers Indemn. Co. v. Stengel,* 2011 WL 6739458, at *7 (under Pennsylvania law, questions of causation are for the jury "unless the evidence is such that

reasonable minds cannot disagree"). Here, any determination that Kriston's actions were a substantial contributing factor relative to Ezequiel's injuries would be lacking in factual support and purely speculative. Because there is no basis in the record to support a rational inference that Kriston proximately caused Ezequiel's injuries, summary judgment in her favor is warranted.

## IV. Conclusion

Based upon the foregoing reasons, the motion for summary judgment filed by third-party defendant Guillermo Juarez (ECF No. 103) will be denied and the motion for summary judgment filed by third-party defendant Jessica Kriston (ECF No. 98) will be granted. An appropriate order follows.


BY THE COURT:


*/s/ Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge


Dated: February 3, 2016